429 P.2d 433

CARTER PACKING COMPANY, a Partnership consisting of Ted L. Carter and Gayle J. Carter, and Lyman L. Carter and Ivy E. Carter, and Ted L. Carter and Gayle J. Carter, husband and wife, individually, Plaintiffs-Appellants,

v.

PIONEER IRRIGATION DISTRICT, and Union Pacific Railroad Company, a Utah corporation, Defendants-Respondents.

No. 9803.

Supreme Court of Idaho.

June 19, 1967.

. Schiller, Young & Williams, Nampa, for appellants.

Moffatt, Thomas, Barrett & Blanton, Boise, for respondent, Pioneer Irr. Dist.

Bryan P. Leverich, Salt Lake City, Utah, and D. A. Bybee, Pocatello, for respondent Union Pac. R. Co.

McQUADE, Justice.

During the evening of January 31 and the early morning of February 1, 1963, abnormal precipitation conditions prevailed in the valley area of Canyon County, Idaho; snow which had collected on the ground was melting in heavy rains accompanied by a chinook wind. On that date, appellants had a meat packing plant operated by Carter Packing Co. and a mobile home kept by Ted L. and Gayle J. Carter, on land in Canyon County which borders part of a drainage ditch, the West End Drain, at the mouth of a culvert which extends under railroad tracks operated by the Union Pacific Railroad Co. and a roadway. The unusual wetness caused a rapid run-off which quickly began to fill the drainage ditch, and as the water's level rose the culvert, which was or became clogged with debris, impeded the flow. Some water escaping the ditch's banks at the mouth of the culvert spilled onto the land occupied by appellants, damaging the packing plant and mobile home.

At the point of overflow, the West End Drain is within the Pioneer Irrigation District, and while the ditch was not used to carry live water to its customers, nevertheless, Pioneer patrolled and maintained it at the culvert's mouth. Union Pacific Railroad Co. had a right-of-way over the culvert and on February 1, 1963, a crew of the railroad's men spent most of the day trying to clear the culvert

To recover their property damages and for losses caused by business interruption, appellants brought this action against Pioneer and Union Pacific, both respondents herein. At the close of appellants' evidence, the trial court on motion dismissed the action against Union Pacific, and after hearing Pioneer's proof, the court dismissed the action against Pioneer. This is an appeal from both determinations.

Dismissal of Union Pacific was proper. After the presentation of a plaintiff's evidence, a defendant "may move for a dismissal on the ground that upon

the facts and the law the plaintiff has shown no right to relief." Idaho R.Civ.P., 41(b). Appellants alleged that the railroad had constructed the culvert inadequately and thereafter improperly maintained it. Regarding construction, the only evidence shows that the United States Bureau of Reclamation built the West End Drain and installed the culvert in question. Concerning maintenance, the record does not establish that the railroad had any duty to maintain the culvert nor that its voluntary assistance on the day in question, in an effort to protect its railroad tracks near the point of overflow, did anything but partly alleviate the situation.

■ Appellants object to a trial court ruling which quashed subpoena duces tecum addressed to agents of respondent Union Pacific, apparently requiring production of all documents in the railroad's control concerning the culvert in question. The record does not contain copies of the subpoenas, nor does the praecipe specifically request their inclusion. Appellants show no abuse of the trial court's discretion in this matter, and no error has been found in the judge's ruling. Idaho R.Civ.P., 45(b); 2B Barron and Holtzoff, Federal Practice and Procedure § 1005 and § 1002 (rev. ed. Wright 1961); 5 Moore, Federal Practice § 45.05 [2], (2d ed. Kurland and Lucas 1966).

■■ The motion to quash was argued on the first day of trial and an agent of respondent railroad, anticipating the possibility of an adverse ruling on the motion, brought to the courtroom several documents which pertained to the culvert. After the subpoena was quashed, appellants' attorney moved the court to permit his inspection of this file. He was not familiar with the file, and was uncertain concerning what he expected to find therein. The court sustained respondents' attorney's objection to the motion, stating:

"Counsel for plaintiff has had many months to exercise his rights of discovery under the rules—Idaho Rules of Civil Procedure. That has obviously not been done, and I am not going to permit a fishing expedition in this matter at this time. The objection [to the subpoenas] will be sustained."

The trial court also rejected appellants' attorney's offer of proof which was based on the information which he hoped to discover from respondent railroad's file. No error is found in either ruling.

Unlike Union Pacific, however, Pioneer Irrigation District had control of and a duty to maintain the ditch at the point of overflow. Therefore, we must consider whether a breach of Pioneer's duty to appellants proximately caused the damage claimed.

■ Before the flood of February 1, 1963, the culvert, unmodified since its installation during 1915—a period of forty-eight years, had never failed to convey adequately whatever drainage flowed through the ditch. The culvert is forty-eight inches in diameter and extends forty feet; the ditch where it met the culvert is at least ten feet wide and equally deep (appellants' brief claims it was even larger but this contention is not supported by an evidence). There was no engineering evidence regarding the technical adequacy of these relative dimensions. Although an additional culvert was installed at the point in question after the February 1, 1963, overflow, this modification has no probative value concerning respondent's duties with respect to the culvert's sufficiency at the time of the overflow. Alsup v. Saratoga Hotel, 71 Idaho 229, 229 P.2d 985 (1951); see Bell, Handbook Of Evidence For The Idaho Lawyer 83 (1957).

During the irrigation season in the autumn of 1959, Pioneer by intentionally dumping excess water from a main canal into a drain which flows into the West End Drain had caused some water to spill onto appellants' land at the culvert. The water did not reach appellants' buildings and caused no damage. This incident has no relevance to the issues here.

■ Appellants contend the evidence establishes that prior to February 1, 1963,

the ditch had overflowed at the culvert on several occasions. In support they rely specifically on testimony of Frank Raeder, a Union Pacific roadmaster, and a letter, plaintiffs' exhibit sixteen, from the railroad's superintendent of operations in Idaho to the State's Department of Health. Raeder's pertinent testimony, however, is uncertain and ambiguous. To the contrary, four witnesses: two directors, the secretary-treasurer and the maintenance foreman of Pioneer Irrigation District, all definitely testified that to their knowledge the only instance of previous overflow had been the deliberate spilling of excess irrigation water in autumn 1959. Moreover, appellant Ted L. Carter, when questioned about flooding prior to February 1963, testified regarding only one incident which had to have been during the autumn of 1959. The letter, which by its terms is irrelevant since it concerns the intentional spilling incident, was admitted only as to Union Pacific since it is hearsay in respect to Pioneer. Upon this record, no error appears in the trial judge's finding that the intentional occasion during autumn 1959 was the only overflow prior to February 1, 1963, from the West End Drain at the culvert in question.

Concerning the abnormal weather conditions, snow which had accumulated on the ground in the area surrounding the culvert dropped from 5.5 to 1.5 inches during the twenty-four hours between 8:00 a. m., January 31 and February 1, 1963. Precipitation which had been recorded as .53 inches at 8:00 a. m. on January 31, 1963, was .75 inches at 8:00 a. m. on February 1, 1963. At the beginning of this period, one witness testified, the ground was frozen. The high temperature which on January 31, 1963, was observed as 26° F., increased on February 1, 1963, to 51° F.

Several witnesses testified that strong winds prevailed at the time and place in question. One witness termed the storm "violent," noting that it had moved structures on his land. In response to the trial judge's question whether the wind was warm or cold this witness called it "a chinook."

The run-off which resulted from these weather conditions was unprecedented in the memory of three witnesses who had been familiar with the neighborhood for, respectively, twenty, thirty, and thirty-five years. Other witnesses testified that heavy run-offs and flood conditions existed all over the general area. No witness testified that he knew of any previous run-off of similar magnitude.

It is clear that the West End Drain overflowed at the culvert in question, thereby spilling water upon land occupied by appellants' property. This, however, is the only fact pertinent to a finding of liability against Pioneer established by the record.

The source of debris which clogged the culvert is unclear, though most of the West End Drain is located outside the Pioneer Irrigation District and numerous small ditches which empty into the drain likewise pass through territory outside Pioneer's boundaries and control.

Moreover, the evidence is not conclusive that had the culvert been clean the extraordinary flow of February 1, 1963, would have passed through without spilling onto appellants' land, for although two witnesses who had little opportunity to observe the culvert said or inferred that the banks at the culvert would have contained the water but for the clog, there is contrary testimony by Frank Raeder, a Union Pacific roadmaster who for eight hours had supervised a crew of railroad men attempting to unclog the culvert. Raeder said, "from my observation I would say from the amount of water that came down would have went [sic] over this ditchbank anyway."

Nor was it established that the spill from the West End Drain was the water which, in the language of appellants' brief, "engulfed the buildings of the appellants in some three feet of water," rather than general flood conditions which many witnesses said had pervaded the valley in which appellants' land lies. Indeed, wit-

nesses for appellants gave testimony which suggests that flood waters pouring onto appellants' land from several different sources, not merely spill from the West End Drain, caused the damage here involved. Thus, appellant Ted L. Carter said that the water reaching appellants' buildings on the day in question had much force to it and had caused washouts adjacent to the buildings; an employee of appellants testified: "The current was striking the building from all angles and it was just in swirls where the corrals came up to the buildings."

Regarding the specific conduct of Pioneer Irrigation District's agents and employees on February 1, 1963, early in the morning the district blocked off a spillway which connects its main canal to a drain which feeds into the West End Drain, and so prevented the escape of main canal water into the ditch in question. The canal apparently contained little, if any, irrigation water at that time, for respondent Pioneer's secretary-treasurer testified that none had been received nor discharged by it since the middle of October 1962. Don Gipe, Pioneer's maintenance foreman, inspected the culvert at 11:00 a. m. There is conflicting evidence concerning the time at which Pioneer had been first notified of the culvert's clogging, appellants contending 7:00 to 8:00 a. m., while the trial judge found respondent's first notice had been between 10:00 and 11:00 a. m. The evidence, while slight, is sufficient to support this finding.

Gipe testified that when he arrived water had not yet reached appellants' buildings and a crew of railroad employees, apparently four men supervised by a foreman, were attempting to clear the culvert. Frank Raeder who reached the scene in the "forenoon" testified that his railroad crew was "fighting this culvert all of the time * *

[W]e kept pulling it out—the debris out—until the water got so high and come with such force that we couldn't get down to the mouth of the culvert to do any more work on it." The struggle had continued, he said, for seven to eight hours while he was present; the crew had been there before his arrival. After assessing the situation at the culvert, Gipe decided, he testified, that Pioneer employees could have accomplished no more than was being done by the railroad crew, and could not have moved heavy equipment to the culvert since the water was already too high. Appellant did not attempt to show that Gipe's assessment and decision were imprudent.

Gipe also observed, he said, that the culvert overflow condition was no different from the flooding in some other parts of Pioneer's district and that all Pioneer's available workers, ten to fifteen men, were dispersed to different spots throughout the district from early morning and all during that day. In the late afternoon, the railroad crew working to free the culvert was joined by Gipe with four Pioneer employees carrying hand equipment. Some men remained till midnight.

The trial court's ultimate finding (XIII) is:

"That the obstruction of the culvert and the flooding of plaintiffs' [appellants'] property was not caused by any act or ommission on the part of either of the defendants [respondents] and that the proximate cause of said flooding and the resultant damage was the unprecedented and unforeseeable run-off of surface water * * *."

The record amply supports this finding and the judgment is therefore affirmed. Costs to respondents.

TAYLOR, C. J., and SMITH, McFADDEN, and SPEAR, JJ., concur.